476 S.E.2d 227

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Roberto Jose LOPEZ, Defendant Below, Appellant.**

**No. 23044.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 17, 1996.

Decided July 18, 1996.

---

Pamela Jean Games–Neely, Prosecuting Attorney, Janet L. Scalia, Assistant Prosecuting Attorney, Martinsburg, for Appellee.

Paul G. Taylor, Henry, Grant, Taylor & Janelle, Martinsburg, for Appellant.

PER CURIAM:

The defendant in this proceeding, Roberto Jose Lopez, was sentenced to life in the State penitentiary without a recommendation of mercy for the felony murder of Elizer Peralta, who died as a result of burns sustained in an apartment fire which erupted on December 30, 1992. On appeal, the defendant claims that the Circuit Court of Berkeley County erred in admitting into evidence his gasoline-soaked clothing which was seized without a warrant. He also claims that the circuit court erred in admitting into evidence a handgun discovered near the fire scene and that the court erred in admitting a statement which he gave shortly after the eruption of the fire. The defendant further argues that the trial court erred in admitting a gruesome photograph of the victim, Elizer Peralta, and that the trial court erred in refusing to accept a plea agreement which he and the State entered into.

After reviewing the issues raised and the record presented, this Court concludes that the trial court did commit reversible error by admitting into the evidence the clothing, and the statement, and, as a consequence, this Court reverses the defendant's conviction and remands this case for a new trial. The Court does not conclude that the trial court committed reversible error in rejecting the plea agreement, and since the rules relating to the admission of gruesome photographs have been altered since the defendant's trial, the Court believes that upon retrial the admissibility of the photograph should be assessed under the new rules. The Court also believes that the relevancy of the handgun should be reassessed on retrial.

The evidence in this case shows that on December 30, 1992, the defendant, who was an undocumented Mexican alien working as an agricultural laborer, and who for practical purposes did not speak the English language, while visiting friends who lived in an apartment located on South Raleigh Street in Martinsburg, West Virginia, became involved in an argument and struggle. In the course of the struggle, one of the individuals present, Rene Cajero, displayed a handgun which another party, Maurillo Chaparro forcibly took from him. Maurillo Chaparro shortly thereafter forced Rene Cajero, Fernando Martinez, and the defendant, Roberto Jose Lopez, to leave the apartment.

Some ten minutes later, Emigdio Olyera, who had remained in the apartment, left, and as he was leaving, he observed the parties who had been expelled from the apartment standing outside the building. One of them, Rene Cajero, indicated to Mr. Olyera that he was "waiting" for Maurillo Chaparro.

At around 10:50 p.m., Maurillo Chaparro, who had remained in the apartment, noticed smoke pouring under the door. He opened it, and a flaming bottle flew into the apartment. A serious fire erupted, and the Martinsburg City Fire Department was called. In the course of the fire Elizer Peralta, who was also in the apartment, suffered second and third degree burns. He died the next day.

In investigating the fire, the Martinsburg City Fire Department quickly determined that gasoline had been used to start the fire and that a passing motorist, Darlene Mancherry, had seen a Mexican male, who appeared to be on fire, exiting the building at about the time the fire erupted. Ms. Moncherry later identified the defendant, Roberto Jose Lopez, as being that Mexican male. The investigation further revealed that shortly before the fire erupted, Virginia Turner, a sales clerk at a nearby 7–Eleven convenience store, had sold a male Mexican, whom she could not later identify, approximately two dollars worth of gasoline. Lastly, a Martinsburg City Police detective discovered a gun just outside the burning building.

About an hour after the fire erupted, at around 11:43 p.m., the nearby Winchester, Virginia, Rescue Squad received a request to transport a burned Hispanic male to the Winchester Hospital. Because there was some suspicion that the individual had been involved in the Martinsburg fire, an officer of the Martinsburg City Police Department, Detective Smartwood, was contacted. This officer traveled to Winchester and met Officer Milholland of the Winchester City Police Department, who had earlier procured the services of a high school Spanish teacher as an interpreter. The officers arrived at the Winchester Hospital at approximately 4:25 a.m. on December 31, 1992, and, before proceeding to contact the burn patient, who turned out to be the defendant in this proceeding, Roberto Jose Lopez, they stopped at a nursing station where they learned that the nurses had the patient's clothing out of view and that it was soaked with gasoline. They asked for it. The nurses produced it, and the police officers, without first obtaining a warrant, seized it.

The police officers and the interpreter then proceeded to the defendant's hospital room, where he gave a tape-recorded statement after he had been given his *Miranda* rights. In the statement he indicated that he had burned his hand when he spilled boiling water on it at a stove and that he had singed his hair when he bent over the stove.

The defendant was indicted for arson and for the felony murder of Elizer Peralta during the February, 1993 term of the Grand

Jury of Berkeley County. No trial was conducted under this indictment, however, and the defendant was reindicted during the May, 1993, term of the grand jury.

Prior to the scheduled trial date, counsel for the defendant and the Berkeley County Prosecuting Attorney's Office entered into plea bargain negotiations. The negotiations resulted in an agreement under which the defendant agreed to plead guilty to first degree murder with a binding recommendation of mercy, and at a hearing conducted on September 3, 1993, the plea agreement was discussed before the circuit court, and the circuit court informed the parties that "[t]he court doesn't feel that it could in good conscience dispense that particular sentence merely by agreement," and the court refused to accept the agreement.

After the breakdown of the plea negotiations, a jury trial was conducted on September 25, 1993, and at the conclusion of that trial the defendant was convicted of the felony murder of Elizer Peralta and was sentenced to life in the penitentiary without a recommendation of mercy. Rene Cajero had earlier been charged with and convicted of the same crime and had received the same sentence.

The first question in the present proceeding is whether the circuit court erred by admitting into evidence of the defendant's clothing, which was obtained at the nursing station at the Winchester Hospital. The defendant claims that this clothing was obtained by the State through an illegal search and seizure and that the trial court should have suppressed its use as evidence.

The record indicates that after the defendant reported to the Winchester Hospital his clothing was removed and placed in a bag by a nurse. As previously indicated, after Detective Smartwood and Officer Milholland arrived at the Winchester Hospital, but before they had contacted the defendant, they learned that the clothing was in the possession of the nurses at the nursing station. They then asked for the clothing, and the nurses handed it over.

At a preliminary hearing conducted on July 14, 1993, Detective Smartwood explained the circumstances surrounding the taking of the clothing. The testimony proceeded as follows:

Q: Why did the nurses offer Mr. Lopez's clothes?

A: I believe Investigator Milholland inquired if—if they had their clothes—if they had his clothes. And they advised that they did.

Q: Let me make sure I understand your testimony, when you approached the station you requested—you asked the nurses what room Mr. Lopez was in, is that correct?

A: I believe Investigator Milholland did, yes, sir.

Q: Okay. And they what did—did Officer Milholland, I mean, how did the issue of clothes come up?

A: I believe he asked if they did have Mr. Lopez's clothing.

Q: Why did he ask them that?

A: He simply asked. He asked, they advised they did. They had it in a bag. He opened it up, again to myself there was an odor of gasoline upon the clothing. They gave Mr.—Investigator Milholland that clothing, but we didn't—I am sorry.

During the actual trial, Detective Smartwood described the taking of the clothing in the following manner:

A: We then went I believe to be the second floor of the hospital in Winchester.

Q: And, where on the second floor did you proceed to?

A: We went to the nurse's station there on the second floor.

Q: At that time did you or Investigator Milholland receive any physical evidence in this case?

A: Yes, Ma'am, we did. That's correct.

Q: And, what physical evidence did you receive?

A: Proceeding there at the nurse's station, we were given clothing of Mr. Lopez.

The State, during trial and on appeal, takes the position that the clothing was in plain view and that, as a consequence, the warrantless seizure of it was legal under the "plain view doctrine."

This Court, of course, has recognized that "[t]he Fourth Amendment of the *United States Constitution*, and Article III, Section 6, of the *West Virginia Constitution* protect an individual's reasonable expectation of privacy." Syllabus point 7, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981). However, as indicated in *Wagner v. Hedrick*, 181 W.Va. 482, 487, 383 S.E.2d 286, 291 (1989):

> A claim of protection under the Fourth Amendment and the right to challenge the legality of a search depends not upon a person's property right in the invaded place or article of personal property, but upon whether the person has a legitimate expectation of privacy in the invaded place or thing. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967). If a person is in such a position that he cannot reasonably expect privacy, a court may find that an unreasonable Fourth Amendment search has not taken place. (Footnote omitted.)

The Court believes that in the present case the threshold question as to the validity of the taking of the defendant's clothing is whether the clothing, while in the possession of the nurses, was in a place where the defendant had a reasonable expectation of privacy.

In addressing this question, the Court is aware that in *Wagner v. Hedrick, supra,* the challenged search was the warrantless search of the clothing of a patient in a hospital and that in that case the Court held that the search was not unreasonable since the defendant did not have a reasonable expectation of privacy with regard to the clothing. In *Wagner v. Hedrick*, the facts show that the complaining party's clothes were removed at a hospital, and the hospital offered to take custody of them for safekeeping. The individual, however, declined the offer and elected to keep them in a basket under the bed in an area apparently frequented by many people. This Court, as previously indicated, found that the defendant, Wagner, did not

have a reasonable expectation of privacy and specifically noted:

> [W]hen Wagner was given the opportunity to insure that his personal effects would be kept in a private place during his hospital stay, he chose not to do so. We note with interest the fact that Wagner rejected an offer by a hospital employee to have his personal effects . . . secured in the hospital safe, thus exposing his property to the possibility that it might be lost, misplaced, or even stolen. . . .

181 W.Va. at 488, 383 S.E.2d at 292.

On the other hand, other courts have indicated that the clothing of patients or others taken in an in-custodial process and retained by the custodian for safekeeping are maintained in a situation here the owner has a reasonable expectation of privacy. *See Morris v. Commonwealth*, 208 Va. 331, 157 S.E.2d 191 (1967); *People v. Hayes*, 154 Misc.2d 429, 584 N.Y.S.2d 1001 (1992); *United States v. Sanchez*, 46 C.M.R. 772 (1972); *Fries v. Barnes*, 618 F.2d 988 (2nd Cir.1980); and *Brett v. United States*, 412 F.2d 401 (5th Cir.1969).

In *Morris v. Commonwealth, supra,* a defendant's clothes were removed and placed in a wardrobe apparently designated to protect such clothes, and, quite similar to the situation in the case presently before the Court, police officers asked a nurse on duty for them. The nurse, without the defendant's consent, removed them and handed them over. The Virginia court stated: "[W]e hold that the seizure by the officer of the defendant's clothes under the related circumstances was in violation of the rights guaranteed to him by the Fourth Amendment to the Federal Constitution." 208 Va. at 334, 157 S.E.2d at 194.

In *People v. Hayes, supra,* the facts indicate that a detective determined that the clothing which a defendant had been wearing when he checked into a hospital was being held for him at the reception desk. The detective asked for it and seized it. The court determined that the seizure was improper and stated: "Hayes relinquished his clothes to the hospital for a limited and specific time and purpose, fully expecting to

recover them after his treatment.... Hayes' property rights to his belongings were violated when they were removed from the hospital without a warrant." 584 N.Y.S.2d at 1004.

In *United States v. Sanchez, supra,* a military enlisted man was charged with stealing a ring belonging to another enlisted person. The accused was hospitalized in a naval hospital and his clothes were locked in a clothing closet. Hospital personnel possessed keys to the closet and turned the clothing over to an investigator. The United States Navy Court of Military Review concluded that the accused enlisted man had an expectation of privacy with regard to the clothes and ruled that they were illegally seized. The Court concluded:

> It is our view that portion of where his clothing was stowed was reserved for the exclusive use of appellant and that he had the right to expect some decree of privacy in the public closet.... Under the circumstances of the case, we find prosecution Exhibit 6 was improperly received into evidence.

In *Brett v. United States,* 412 F.2d 401 (5th Cir.1969), the police arrested a man and conducted a superficial search incident to the arrest. They then placed his clothes in safekeeping. Still later, they conducted a warrantless search of his clothing. The court, recognizing that there was an expectation of privacy in the safe-keeping arrangement, said:

> We note that there was ample opportunity to apply for a search warrant, to submit to a magistrate the evidence which the officer deemed sufficient to justify the late search of appellant's stored clothing. In this case '[t]he need for effective law enforcement is not satisfied as against the right of privacy by any necessity for the officer to take the decision into his own hands.' *Rent v. United States,* 209 F.2d 893, 899 (5th Cir.1954).

413 F.2d at 406.

Similarly, in *Fries v. Barnes, supra,* the court suggested that a patient whose clothing was in the custody of a hospital had a sufficient expectation of privacy to raise constitutional questions when the clothing was seized in a warrantless search.

It appears to this Court that the crucial distinction between *Wagner v. Hedrick, supra,* and the other cases discussed above is that in *Wagner* the defendant refused to turn his clothing over to others for safekeeping and that he kept it in a semi-public area.

Overall, the Court believes that the facts in the present case are unlike those in *Wagner v. Hedrick* in that it appears that that clothing was in safe keeping with the hospital authorities. Under such circumstance, the Court believes that the defendant had a sufficiently reasonable expectation of privacy with regard to the clothing for it to be protected by the Fourth Amendment and Article III, section 6 of the West Virginia Constitution.

Having so concluded, this Court believes that for the warrantless search to be valid, it must have been conducted under one of the exceptions to the warrant rule. *See State v. Moore,* 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled on other grounds, State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991). As previously noted, the State has argued that it falls within the "plain view" exception.

In *State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991), the Court discussed the plain view exception and in syllabus point 3 stated:

> The essential predicates of a plain view warrantless seizure are (1) that the officer did not violate the Fourth Amendment in arriving at the place from which the incriminating evidence could be viewed; (2) that the item was in plain view and its incriminating character was also immediately apparent; and (3) that not only was the officer lawfully located in a place from which the object could be plainly seen, but the officer also had a lawful right of access to the object itself.

In the present case, there is nothing to indicate that Detective Smartwood and Officer Milholland arrived at the Winchester Hospital in a manner which violated the Fourth Amendment. However, the testimony of Detective Smartwood, which has been quoted extensively above, unequivocally shows that the defendant's clothing was not in plain view at the time the officers arrived

at the nursing station and that they actually learned that the clothing was at the nursing station only after Officer Milholland specifically asked about it. Since it was not in plain view, this Court cannot conclude that it was in "plain view", which is the second predicate for a "plain view" search and seizure set forth in syllabus point 3 of *State v. Julius, Id.,* and consequently the Court cannot conclude that it was properly seized as the result of a plain view warrantless seizure.

In view of the overall circumstances, this Court finds that the seizure of the defendant's clothing was conducted outside the judicial process and was *per se* unreasonable. Further, the Court finds that the trial court erred in failing to suppress the clothing and admitting it into evidence during the defendant's trial.

 The defendant next claims that the trial court erred in admitting into evidence a statement given by him at the Winchester Hospital to Detective Smartwood and Officer Milholland through Mr. C.B. Ashby, an interpreter of the Spanish language. The defendant argues that this statement was not voluntarily given and was admitted in violation of his constitutional right against self-incrimination.

The record shows that at the time of the taking of the statement the defendant was under the influence of Demerol, a painkiller which had been administered in conjunction with the treatment of his burns. The statement was tape recorded after the police officers purportedly gave him his *Miranda* rights and after he purportedly waived those rights.

In the statement the defendant explained that he had burned himself while making coffee, and he denied that he had ever been in Martinsburg, West Virginia. Specifically, the colloquy in which his explanation was given proceeded as follows:

A: I put water for the coffee and then I dropped the water. It was boiling, it was very hot because I put it full and then, I dropped the water and when I went to grab the pot water spilled over here and I did like so and I burned my hair on the stove, because it was in full volume.

Q: The stove?

I [interpreter]: He was heating water for coffee ... and he was pouring ... hot water, true?

A: Hot water

I: And he burned his hand, and when he bent over his head and hair got caught in the stove ... with the

Q: And the stove caused that problem?

I: The stove?

A: The stove

I: Burned ...

A: Yes, I burned myself

I: The stove caused the burn

A: When I leaned over I hit the stove and I burned

I: Uhum.

Q: How did the hand get burned?

I: The hand ... the hand was burned by hot water, true?

A: I dropped the hot water.

I: He poured. He says ... the hot water ... he was pouring his coffee. He poured on his hand.

Q: Ah!

I: That is what caused him to bent over, I think, towards the stove ... stove ... the stove burned your hair

A: Yes, and when I bent over to grab the pot

I: He bend down to pick up

A: It was very hot here and when I grabbed the pot I bent, I burned myself on the stove.

I: I understand, yes ... when he bent over to clean up, to pick up ... that is when he stuck his head across the stove

Q: His hand got burned from the water ...

I: Hot water

Q: He was heating for coffee

I: Yeah.

Q: Where did all this happen, then?

I: Roberto, where did all happen? In Winchester, here?

A: Yeah.

The defendant was later asked about gasoline on his clothes, and apparently the defendant denied there was gasoline on his clothes.[1]

The State apparently sought to introduce this statement to demonstrate that the defendant was not forthcoming about the origin of his burns, since his explanation was inconsistent with the fact that the defendant's clothing, which the officers had just seized, was soaked with gasoline.

In challenging the voluntariness of the statement, the defense, in addition to pointing out that the defendant was in the hospital, under the influence of Demerol at the time he gave the statement, introduced evidence that the defendant had the mental capacity of a five-year-old. Further, Dr. Jesus Saavadera, a Spanish-speaking psychiatrist employed by the United States Public Health Service, testified that the defendant had the mental capacity of a five-year-old, that he had borderline mental functioning, and that he thought only in concrete terms. Dr. Saavadera indicated that the defendant was unable to understand abstract concepts such as the right to silence, and he expressed the opinion that at the time the defendant gave the statement "he was completely out of his mind."

Additionally, the defense introduced evidence that the translation which occurred during the taking of the statement was so defective that the defendant gave the statement without being meaningfully notified that he had the right to remain silent and without being notified that he had no duty to give a statement and should do so only if he voluntarily undertook to do so. Specifically, the defense called as an expert witness Mr. Edgar Martinez, an attorney and a federal court certified interpreter of the Spanish language. Mr. Martinez, who lived in Puerto Rico for thirty-three years and who had practiced law in the Spanish-speaking local courts of Puerto Rico for nine years, testified that the interpreter used by Detective Smartwood and Office Milholland did not make an accurate translation of the officers' questions. He said:

> He [Mr. Ashby, Detective Smartwood and Officer Millholland's interpreter] did not make the accurate—not only did he not literally transcribe it, he even omitted the use of the word like you have the right to remain silent. . . .

\* \* \* \* \* \*

> . . . It is very clear, that to me, that the translator was trying to help the policeman with whom he was in attendance to gather information about what was happening. And he [Ashby], on his own, was proffering questions that the policeman was not even asking. . . .

\* \* \* \* \* \*

> . . . In terms of the Spanish and English that is used and the way that it was brought together, uh, to me it was not an accurate translation and it would not convey to somebody, for example, that is supposedly being told that they have a right to remain silent, and what have you, they would not, in my opinion, get a clear understanding that they had that right and that they could have exercised it. . . .

The defense's claim that Mr. Ashby's interpretation was inadequate was supported by Dr. David Rojas, an expert for the State, who in a letter dated August 30, 1993, said:

> It is my opinion that given Mr. Lopez's poor command of the English language, he was not able to understand the Miranda

1. The defendant's actual intended response is unclear since it is obvious the interpreter was having difficulty translating at this point. The transcript shows that the interpretation proceeded as follows:

Q: How he got gasoline in his clothes?
I: There is "gaso" . . . gasoline in your clothes
A: Ah?
I: There is gasoline in your clothes
A: No

I: Yes, there is gasoline . . . It smells to gasoline . . . in your clothes . . . do you know . . . how can I be . . . gasoline . . . in the clothes
A: No, no. I don't even remember.
I: Can't you remember?
A: Nothing
I: Nothing about gasoline . . . He doesn't know.
Q: He doesn't know how he got on or he doesn't think it is on?
I: He denied it is on there . . . but he doesn't know how he got there

rights as read in English. It is also my opinion that the interpreters' translation of the rights did not facilitate Mr. Lopez's understanding of his Miranda rights to the point of allowing him to answer questions entirely free and voluntary.[2]

■ In syllabus point 5 of *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975), this Court stated:

> The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case.

*See also, State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982); *State v. Rissler*, 165 W.Va. 640, 270 S.E.2d 778 (1980); *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979); and *State v. Laws*, 162 W.Va. 359, 251 S.E.2d 769 (1978).

In *State v. Persinger, supra*, the Court discussed the circumstances under which the question of voluntariness should be properly be judged. The Court stated:

> [T]he voluntariness of a confession is an inquiry that must be gauged by the totality of the circumstances under which it was given including the background, experience and conduct of the accused. *See Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

169 W.Va. at 129, 286 S.E.2d at 267. Further, in *State ex rel. Williams v. Narick*, 164 W.Va. 632, 636, 264 S.E.2d 851, 855 (1980),

the Court indicated to determine whether a statement was voluntary, one must ask whether the statement is "the product of an essentially free and unconstrained choice by its maker."

As has been previously indicated, the defendant in the present case, who was an undocumented Mexican alien, was hospitalized and was under the influence of Demerol at the time he gave the statement in issue in this case. There was also evidence that he was a migrant farm worker and an individual with low intellectual functioning and little education.

As indicated in *State v. Persinger, supra*, the voluntariness of a statement must be gauged by the totality of the circumstances under which it is given, including the background, experience, and conduct of the accused.

In the present case, the evidence rather clearly shows that the defendant was of low intellectual capacity and little education. At the time he gave the statement, he was in a disabling, hospital situation, and he was drugged. Further, he was an illegal alien, confronted by officers of an American state.

The circumstances were such as to suggest that he was not wholly aware that he had a legal right to refrain from making a statement.

Our law contemplates that in such a situation a statement given is not legally admissible into evidence unless the individual is clearly informed of his right to refrain from making a statement and unless the individual, of his own volition, decides to abandon his right to silence and to make a statement. *See State v. Rissler, supra*.[3]

---

**2.** The trial court, apparently in the interest of expediting the proceedings, felt that it was unnecessary to adduce the actual testimony of Dr. Rojas. The court said:

> Nor do I think it necessitates having Dr. Rojas be here before, and be questioned, I will take it as given, because I don't see any variance in the representations made by either the State or the defense as to what that gentleman would say on the basis of the letter....

**3.** We perceive that the defendant's statement was incriminating for two basic reasons: (1) an attempt at exculpation which is shown to be false or which opens the accused to further investiga-

tion on specific facts can be highly damaging to an accused, and (2) the statement with which we are concerned dealt in considerable detail with the subjects of gasoline and its handling. The defendant's clothes were soaked with gasoline at the time he was admitted to the hospital, and the defendant's statement rather clearly suggests that he was not telling the truth and was unwilling to tell the police the truth. Further, it is obvious that the investigating officers considered the gasoline a key to solving this crime. They were aware that the defendant's clothes were gasoline-soaked before they went to the defendant's room, and during their questioning of him, when he did

In the present case, evidence was adduced, and the statement itself shows, that at the time of the taking of the statement, Mr. Ashby, the interpreter employed by Detective Smartwood and Officer Milholland, was struggling to translate and, in fact, did not communicate essential portions of the colloquy. The State's own expert, Dr. David Rojas, in his letter, said:

> [The defendant] was not able to understand the ... rights as read in English. It is also my opinion that the interpreter's translation of the rights did not facilitate Mr. Lopez's understanding of his ... rights to the point of allowing him to answer questions entirely freely and voluntarily.

This Court believes that the record fails to establish by a preponderance of the evidence, as is required by syllabus point 5 of *State v. Starr, supra,* that the statement was voluntary, and, under the circumstances, the Court believes that the trial court erred in admitting it into evidence.

The defendant next claims that the circuit court erred in permitting the admission into evidence of a gruesome photograph when, according to the defendant, the photograph was not relevant, was not probative of a fact of any consequence, and was not essential to prove the offense.

The photograph in question was a black and white photograph which showed a fireman and an individual in civilian clothes loading a burned body onto a stretcher. In the background of the photograph was a brick building, which had on it a sign which stated "Grove Furniture" and along side of which firemen were obviously fighting a fire. The burned body was that of Elizer Peralta, the individual who died from injuries sustained in the fire. Mr. Peralta occupied only a small portion of the overall photograph. His body was badly charred, and fragments of clothing were hanging from it.

According to the State, the photograph was offered to establish a nexus between the victim's death and the fire involved in the present case. Defense counsel objected to the admission of the photograph and argued

that it had little probative value and the probative value was substantially outweighed by the danger of unfair prejudice.

■ In assessing the admissibility of the photograph, the trial court relied upon the principles set forth in the case of *State v. Rowe,* 163 W.Va. 593, 259 S.E.2d 26 (1970), which stated the law on gruesome photographs at the time of the defendant's trial in September, 1993. Subsequent to the trial *State v. Rowe* was overruled in *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994). Specifically, in syllabus point 6 of *State v. Derr* the Court stated:

> Whatever the wisdom and utility of *State v. Rowe,* 163 W.Va. 593, 259 S.E.2d 26 (1979), and its progeny, it is clear that the *Rowe* balancing test did not survive the adoption of the West Virginia Rules of Evidence. Therefore, *State v. Rowe, supra,* is expressly overruled because it is manifestly incompatible with Rule 403 of the West Virginia Rules of Evidence.

In *State v. Derr,* the Court announced new rules for assessing the admissibility of gruesome photographs. In syllabus point 7, the Court stated:

> The West Virginia Rules of Evidence remain the paramount authority in determining the admissibility of evidence in circuit courts. These rules constitute more than a mere refinement of common law evidentiary rules, they are a comprehensive reformulation of them.

In syllabus point 8, the Court stated:

> The admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence.

Finally, in syllabus point 9, the Court stated:

> Although Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule

not raise the point, they specifically asked him about it.

403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence.

It is obvious from what the Court has heretofore stated in this opinion that the defendant's conviction must be reversed for reasons other than the admission of the so-called gruesome photograph and the case must be remanded for a new trial. It is also obvious that it is impossible to state at this point what evidence will be adduced at the new trial relating to the relevancy and necessity for admitting the gruesome photograph, as well as to its potential prejudicial affect. Inasmuch as the defendant's conviction must be reversed on other grounds, this Court does not believe that it is necessary to determine whether the admission of the photograph by the trial court was appropriate in the defendant's trial, especially in view of the fact that the rules relating to the admission of such evidence have been altered by the decision in *State v. Derr, supra.*

The Court believes, however, that should defense counsel, upon remand, again interpose an appropriate objection to the admission of the gruesome photograph in issue or any gruesome photograph, the trial court should weigh the admission of that photograph in light of the factors set forth and explained in *State v. Derr, supra.*

A somewhat similar problem is presented by the gun discovered outside the building which the defendant allegedly set on fire. The State, as previously indicated, introduced evidence showing that the defendant had been present at an altercation involving a gun a short time prior to the eruption of the fire, and shortly after the eruption of the fire a handgun was found outside the building. The State, so far as this Court can determine, in no way definitively connected the gun which was discovered with the crime or even with the altercation which preceded the fire.[4] The authorities could identify no

fingerprints on it, and there was no evidence suggesting that the defendant had ever possessed, used, or touched it.

The defendant at trial claimed, and on appeal claims, that the pistol was irrelevant to the crime charged, that it had no probative value, and that its introduction into evidence was improper under Rule 402 of the West Virginia Rules of Evidence.

For the reasons previously stated, the defendant's conviction is being reversed on other grounds and this case must be retried. It is obviously unclear what the evidence will be on retrial, and it is not wholly clear how the State will attempt to establish the relevancy of the gun. For this reason, the Court does not feel that it is necessary to predetermine the relevancy of the evidence. The Court does note, however, that Rule 402 of the West Virginia Rules of Evidence provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of West Virginia, by these rules, or by other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible.

Further, Rule 401 of the West Virginia Rules of Evidence defines "relevant evidence". That rule states:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Recently in *McDougal v. McCammon,* 193 W.Va. 229, 455 S.E.2d 788 (1995), this Court examined this definition and concluded:

Under Rule 401, evidence having *any* probative value whatsoever can satisfy the relevancy definition. Obviously, this is a liberal standard favoring a broad policy of admissibility. For example, the offered evidence does not have to make the existence of a fact to be proved more probable

---

**4.** The parties in their briefs do not identify precisely where in the record all the discussions relating to the admissibility of the gun occurred during the trial under review. The defendant's brief suggests that portions of the discussions

may be missing from the official transcript. As a consequence, the Court can only speculate as to what the argument regarding relevancy may have been.

than not or provide a sufficient basis for sending the issue to the jury.

*Id.* at 236, 455 S.E.2d at 795. This is consistent with the statement in F. Cleckley, *Handbook on West Virginia Criminal Evidence,* 1995 Supp., page 13, that:

> ... evidence that does not directly establish an element of an offense may be relevant to show the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.

■ On retrial, the trial court should assess the relevancy of the gun, if it is proffered into evidence, in accordance with applicable principles, and at the very least the Court believes the State must in some way to establish the relevance of the gun to the crime, the defendant, or the events surrounding the crime. If the focus is on the incident preceding the crime, the State must establish some identity or connection between the gun involved in the incident and the gun which the State seeks to introduce.

Another assignment of error argued by the defendant is that the trial court erred in failing to seek appropriate information, in failing to make findings, and in failing to follow the appropriate standards and make a mature decision, as is required by Rule 11(e) of the West Virginia Rules of Criminal Procedure, when the court refused to accept the plea bargain agreement tendered to it by the State and accepted by the defendant.

Rule 11 of the West Virginia Rules of Criminal Procedure governs a trial court's handling of plea agreements, and Rule 11(e)(4) governs the rejection of a plea agreement. That rule states:

> Rejection of a plea agreement.—If the court rejects the plea agreement, the court shall, on the record, inform the parties of this fact, advise the defendant personally in open court or, on a showing of good cause, in camera, that the court is not bound by the plea agreement, afford the defendant the opportunity to then withdraw the plea, and advise the defendant if he or she persists in a guilty plea or plea of nolo contendere, the disposition of the case may be less favorable to the defen-

dant than that contemplated by the plea agreement.

■ A close examination of Rule 11 indicates that it prescribes procedures to be followed where a defendant has actually entered a guilty plea pursuant to a plea bargain agreement. In stating that the court shall "afford the defendant the opportunity to then withdraw his plea [upon the rejection of a plea bargain agreement], and advise the defendant that if the defendant persists in a guilty plea or plea of nolo contendere, the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement", the rule is clearly contemplating that a defendant's right to proceed to trial where a plea bargain is rejected shall be protected by a court's ensuring that the defendant shall have an opportunity to return to his status prior to entering the plea pursuant to the plea bargain agreement.

In the present case, the defendant did not enter a plea of guilty or a plea of *nolo contendere* in conjunction with the presentation of the plea bargain agreement to the court. In view of the fact that no plea had been entered, it is rather obvious to this Court that it was not necessary for the trial court to afford the defendant the right to withdraw his plea or to notify him that if he persisted with the guilty plea, or his plea of *nolo contendere,* the disposition of his case might be less favorable than that contemplated by the agreement. The only other requirement of Rule 11(e)(4) was that the court advise the defendant personally, either in open court or *in camera,* that the court was not bound by the agreement.

A fair reading of the remarks made by the court rather clearly indicates that the court did not feel that it was bound by the agreement and that it was rejecting the agreement. The court stated:

> ... [T]he Court is of the opinion that binding pleas are always pleas which the Court has to be convinced it can square with its own—with its own good conscience when it's asked to dispense a certain—a certain sentence for a certain crime. And the nature of the plea to first degree with the binding disposition of mercy would be to bind this court to dispense that sentence

as it has the appropriate sentence for this crime and it just appears to the Court from a view of the nature of the allegations contained in the case, the Court doesn't feel that it could in good conscience dispense that particular sentence merely by agreement, that it—it—the Court would reserve the right to be swayed by additional evidence and argument during the conduct of the trial, of course, but pretrial as a—as a matter of being bound to give that sentence, the Court would not accept to have its discretion bound in that manner.

Overall, the Court cannot conclude that the trial court's rejection of the plea agreement was violative of the defendant's rights or constituted prejudicial error.

For the reasons stated, the judgment of the Circuit Court of Berkeley County is reversed and the case is remanded for a new trial.

Reversed and remanded.

WORKMAN, Justice, dissenting:

This case portrays the increasing use of per curiam opinions to alter the law as it currently exists in West Virginia while declining to enunciate the change in a new syllabus point. It illustrates an evolving problem that this Court should correct. Although this is not the first example of this phenomenon, it is the one least justified. In the past some good reason has existed. It has occurred where there has been a "compromise" decision. It has occurred when the membership of the Court has been in a state of flux, with all the accompanying philosophical shifting, and a "temporary" court had the good judgment to recognize that it was not the time to make major policy changes in the law. None of those phenomenon are present here.

The majority opinion presents, however, more than a procedural lapse. It strikes at the heart of our *stare decisis* doctrine. For unexplained reasons, the majority opinion attempts to alter the law by not discussing the existing syllabus point most closely applica-

ble to the issues at hand. In *Wagner v. Hedrick*, 181 W.Va. 482, 383 S.E.2d 286 (1989), we held: "Although injured persons being treated in a hospital emergency room are entitled to Fourth Amendment protections, the degree of privacy they are reasonably entitled to expect may be diminished by the circumstances[1] under which they are brought into the hospital." *Id.* at 483, 383 S.E.2d at 287. I believe the *Wagner* standard should not only have been discussed but also applied in this case. But, more importantly, the majority's refusal to even discuss our most relevant precedent will inevitably create confusion in our lower courts.

The Fourth Amendment to the United States Constitution and Article 3, § 6 of the West Virginia Constitution "protect[ ] people from unreasonable government intrusion into their legitimate expectations of their privacy." *United States v. Place*, 462 U.S. 696, 706–07, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). Whether a defendant has standing to challenge a search under our Constitution depends upon two factors: (1) whether one demonstrated by his conduct a subjective expectation of privacy, and (2) whether society is prepared to recognize that expectation as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). Before applying these requirements to the present case, I note the evidentiary burden borne by a defendant seeking to suppress evidence on Fourth Amendment grounds. If a party moves to suppress evidence obtained as a result of an allegedly unconstitutional search, he or she has the obligation to demonstrate a subjective expectation of privacy that society is prepared to recognized as reasonable. This precept stems from the general rule that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth amendment rights were violated by the challenged search and seizure." *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424, n. 1 58 L.Ed.2d 387 (1978); *State v. Nelson*, 189 W.Va. 778, 434 S.E.2d 697 (1993); *State*

---

1. In *Hedrick*, the defendant arrived at the emergency room of the hospital as a result of being involved in a motorcycle accident. 181 W.Va. at 484, 383 S.E.2d at 287. Similarly, in the instant case the Appellant went to the hospital on his own. There was not state involvement in the circumstances under which either of these Appellant's got to the hospital.

*v. Tadder,* 173 W.Va. 187, 313 S.E.2d 667 (1984).

I turn to the question of whether this Appellant has met the two requirements for standing to challenge the search. As to the first half of the standing inquiry, the Appellant's personal, subjective expectation of privacy was unclear. A subjective expectation of privacy is a question of intent which may be inferred from words, acts, and other objective facts. Although the treatment he sought is one in which participants usually do not seek privacy in their clothes that are removed, the fact of medical treatment cannot, in itself, be dispositive of the subjective expectation. For purposes of discussion, I will assume the Appellant has demonstrated a subjective intent to retain the privacy interest of his clothes.

Regardless, of the Appellant's subjective expectations, he plainly fails the second half of the standing test; that is, he did not assert an expectation of privacy that society is prepared to recognize as reasonable. "If the inspection by the police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause." *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). The Appellant contends that when his clothing was removed[2] at the hospital and placed in a bag by nurses, he retained a legitimate expectation of privacy in the clothes. I do not believe he did.

The Appellant's clothing was with the hospital personnel. It is reasonable to believe that a patient seeking treatment for burns would expect hospital personnel to examine and take control of the clothing that were worn by him at the time the burns were obtained. *See United States v. McKennon,* 814 F.2d 1539, 1544 (11th Cir.1987) ("Extenuating circumstances can erode the reasonableness of a privacy expectation to the extent that the interest is not constitutionally protected"). In any event, the clothes were in legal possession of the hospital personnel. No limitations were placed on their use by the Appellant. The law is that a bailee in

legal possession and control of personal items has a legitimate expectation of privacy in the items possessed. The hospital personnel had control of the clothes and the authority to exclude other's access to the clothes. The hospital personnel also had the authority to allow others access to the items in their lawful possession. By committing the clothes to the possession and control of hospital personnel without placing limitations on the bailee, the Appellant assumed the risk of that the hospital personnel would allow authorities access to the clothes. *Cf. United States v. Jacobsen,* 466 U.S. 109, 117, 104 S.Ct. 1652, 1658–59, 80 L.Ed.2d 85 (1984) ("It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information."); *United States v. Mithun,* 933 F.2d 631, 634 n. 3 (8th Cir.), *cert. denied,* 502 U.S. 869, 112 S.Ct. 201, 116 L.Ed.2d 161 (1991) ("[The defendant] assumed the risk that hotel employees would discover the contraband and reveal the information to the authorities.").

Although the Appellant did not intend for the nurse to turn over the clothes to the authorities, he voluntarily gave the hospital personnel the ability to do so. To be clear, there is no reasonable expectation of privacy in situations such as these because the defendant's privacy is contingent in large measure on the decision of another. Decisions of either the defendant or the hospital personnel define the extent of the privacy involved. Thus, undergirding the rule set forth in *Hedrick* is the notion that a hospital patient's clothing is held to a lower protection of privacy under Fourth Amendment analysis. The lower expectation of privacy results from the ready access to the clothing by hospital personnel. It is reasonable to recognize that the hospital personnel had the right to permit inspection by the police in their own right and that the defendant has assumed the risk that a nurse or other hospital personnel might permit clothing to be inspected by the

---

**2.** The record is unclear as to exactly how the nurses come into possession of the clothes, but the Appellant in no way demonstrated that he

entrusted them with the hospital personnel with any expectation of privacy.

police. Because the "nature of the transaction hardly supports a reasonable inference that [defendant] took normal precautions to maintain his privacy," *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980), I conclude that the Appellant did not have an objectively reasonable expectation of privacy in his clothes.

Both the holding and rationale of *Hedrick,* a case where the facts are extremely analogous to those in the instant case, support my conclusion. With the exception that the defendant in *Hedrick* had been given the opportunity to have his clothing "secured" by hospital personnel, they are almost identical. *Id.* at 488, 383 S.E.2d at 292. The defendant declined this opportunity, choosing instead to keep the clothes in a container under his hospital bed in a place in which he certainly could be said to have possibly anticipated perhaps even more personal security and more of an expectation of privacy than the Appellant in the instant case. *Id.* at 485, 383 S.E.2d at 289. As we pointed out in *Hedrick,*

> Any expectation of privacy which Wagner [the defendant] may have had could not be termed "reasonable" because he was in a hospital emergency room, one which may people had access to and in which many people, particularly medical personnel, were constantly moving around. The area was freely accessible to law enforcement officers, and Trooper Pinion had a right to be there that night by virtue of his duty to investigate this particular accident. It is apparent that Wagner had very little control over what happened in the emergency room area and that he and his personal effects could be placed wherever the hospital staff chose to put them.

*Id.* at 487, 383 S.E.2d at 291.

It is evident in the instant case that both the law and the facts of *Hedrick* are dispositive of the issues raised sub judice. It is inconceivable how the majority concluded that the Appellant here had more of an expectation of privacy than did the defendant in *Hedrick.* In light of our factual discussion in *Hedrick,* the record in the instant case is devoid of any evidence that the Appellant had more control over the what occurred

with the nurses at the nurses station than did the defendant in *Hedrick. See id.*

Even assuming that the Appellant had maintained a reasonable expectation of privacy beyond that expressly recognized in *Hedrick,* still the majority erroneously suggests that "this Court cannot conclude that it was "'plain view.'" In my judgment, the seizure of the clothes by the police fits squarely within the plain view doctrine because the object's incriminating character was immediately apparent. The majority, however, incorrectly focused its plain view analysis solely on that fact that "the testimony of Detective Smartwood ... unequivocally shows that the defendant's clothing was not in plain view at the time the officers arrived at the nursing stations." This focus is centered upon the fact that the clothing was not within the officer's sight. As Justice Cleckley states in his treatise on criminal procedure: "The plain view doctrine encompasses more than simply seeing contraband. For an object to be in plain view it must be obvious to the senses but need only reveal itself in a characteristic way to one of the senses." 1 Franklin D. Cleckley *Handbook on West Virginia Criminal Procedure* at 304–05 (1993) (citing *United State v. Norman,* 701 F.2d 295 (4th Cir.1983); *United States v. Haynie,* 637 F.2d 227 (4th Cir.1980)). It appears from the trial court's ruling at the suppression hearing that when the clothes were offered to the officer's by the nurses, the clothing "had obvious evidentiary value, in that they, apparently, emanated a smell of petroleum product which was immediately apparent, by the testimony, apparent to the senses." The decision of the United States Supreme Court in *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) teaches us that it was not unconstitutional for the officer to look inside the bag of clothing. As the plurality said in *Brown:* "... there is no reason [the officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy." 460 U.S. at 740, 103 S.Ct. at 1542.

Once the officer smelled the "petroleum product" coming from the clothes, and given

the circumstances of the defendant's hospitalization, it was not unreasonable for the officer to seize the clothes without a warrant. "Whether or not the discovery was inadvertent, the warrantless seizure of evidence of crime in plain view is [not] prohibited by the Fourth Amendment ..." *Horton v. California,* 496 U.S. 128, 129–31, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990); *see also State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991). Under these circumstances, the trial court did not err in determining that the clothing could have properly been seized under plain view by virtue of the officer's smelling the gasoline emanating from the clothing.

Nevertheless, however one views this issue, let's at least agree that if we alter or expand on established law, we should write a syllabus point.[3]

The second area of concern is this Court's decision regarding the admissibility of the Appellant's statement at trial. The trial court ruled that the statement was admissible on the grounds that the Appellant was not in custody when his statement was taken. The Appellant acknowledges in his brief before this Court that: "there was *no* arrest. Officer Smartwood made it clear in both the suppression hearing and in his testimony at the trial that the Appellant was not under arrest or placed under arrest at the time of their interrogation at Winchester Hospital." (emphasis in original). The majority, however, proceeds to agree with the Appellant's contention that the statement was not volun-

tarily given and was admitted in violation of his constitutional right against self-incrimination.

The problem with the majority's analysis is that to get to the admissibility of the confession on self-incrimination grounds, the statement must arise out of a custodial interrogation. Absent custodial interrogation, the *Miranda* rights are not triggered.[4] In *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995) we stated that:

> To the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value. As the Supreme Court recognized in *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307 (1980), "[i]t is clear ... the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." We believe the same reasoning applies where a defendant is being interrogated, but he is not in custody. The "inherent compulsion" that is brought about by the *combination* of custody and interrogation is crucial for the attachment of *Miranda* rights. Our refusal to extend the *Miranda/Edwards* protections to noncustodial interrogation is consistent with the goals of *Miranda* ....

---

**3.** Furthermore, it also appears that the Appellant may have waived his Fourth Amendment right because the record reflects that the officers took the clothing to the Appellant, who identified them as the clothing he had been wearing and who made no objection to the officer's taking the clothing. Although the record is unclear as to whether the Appellant was specifically asked if the officers could retain his clothing, the translation of the statement makes it clear that the Appellant was willing to cooperate with the officers. In fact, Officer Milholland specifically asked if he could search the Appellant's residence for other items, and the Appellant consented to that search. *See State v. Buzzard,* 194 W.Va. 544, 461 S.E.2d 50 (1995) (indicating that an individual can waive his Fourth Amendment right).

**4.** Even if we were to assume the Appellant was in custody when he gave the statement, and also that the statement given was inadmissible under

*Miranda,* the trial court's decision still should be affirmed, under harmless error analysis. Rule 52 of the Rules of Criminal Procedure provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." *Id.; see* Syl. Pt. 20, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974) ("Errors involving deprivation of constitutional rights will be regarded as harmless only if there is not reasonable possibility that the violation contributed to the conviction."). It is indeed difficult to comprehend how the admissibility of the Appellant's exculpatory statement which supported the Appellant's defense that he did not commit the crimes with which he was charged could affect the Appellant's substantial rights. Consequently, given the majority's conclusion regarding the voluntariness issue, the trial court's decision in this matter should have been found to be harmless error. *See id.*

193 W.Va. at 530, 457 S.E.2d at 467 (citation omitted). Moreover, the initial determination of whether the Appellant was in custody is based on " 'the *objective circumstances of the interrogation,* not on the subjective views harbored by either the interrogating officers or the person being question.' " *State v. Hopkins,* 192 W.Va. 483, 453 S.E.2d 317, 320–21 (quoting *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994)).

In the instant case, the evidence affirmatively established that the Appellant was not in custody during the taking of the statement. The Appellant was at the hospital of his own volition. He was in at least a semiprivate area and was under no restraint. Further, medial personnel were free to enter and exit his room. The officers neither touched nor attempted to restrain him in manner. Only two officers and the interpreter were in the room throughout the interview and the Appellant was advised that he was not under arrest and could leave if he so desired. Our cases have consistently held: "Limited police investigatory interrogations are allowable when the suspect is expressly informed that he is not under arrest, is not obligated to answer questions and is free to go." Syl. Pt. 2, *State v. Mays,* 172 W.Va. 486, 307 S.E.2d 655 (1983). Syl. Pt. 3, *State v. Jones,* 193 W.Va. 378, 456 S.E.2d 459

(1995). Although the Appellant argued that he was not free to leave as long as he had only the hospital gown to wear, that is clearly insufficient to render him to be "in custody." "[T]he mere fact that the [Appellant] did not feel free to leave the [hospital room] does not mean that the police seized him." *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). When a person is in a hospital bed receiving medical treatment "and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." *Id.* Whatever compulsion existed to keep the Appellant from leaving resulted from his medical condition and not from coercive police conduct. *See INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Consequently, the trial court's determination that the Appellant was not in custody should have been upheld.

Accordingly, based on the foregoing reasons, I dissent.[5]

---

**5.** I cannot leave this case without several other comments. I would uphold the admission of the gun as circumstantial evidence, rather than directing the trial court to reconsider the relevancy of the gun on retrial of the defendant. The majority is correct in stating that Rule 402 of the West Virginia Rules of Evidence provides that "[a]ll relevant evidence is admissible...." *Id.* Moreover, the majority correctly states that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* Further, the majority correctly relies upon our recent examination of Rule 401 in *McDougal v. McCammon,* 193 W.Va. 229, 455 S.E.2d 788 (1995), where we stated that

> [u]nder Rule 401, evidence having *any* probative value whatsoever can satisfy the relevancy definition. Obviously, this is a liberal standard favoring a broad policy of admissibility. For example, the offered evidence does not have to make the existence of a fact to be proved more probable that not or provide a sufficient basis for sending the issue to the jury.

*Id.* at 236, 455 S.E.2d at 795.

Although the Appellant argued that the gun was irrelevant because there was no proof of his ownership or possession of the gun, the record clearly established that the fire was set subsequent to a fight between Mr. Chaparro, Mr. Cajero and Mr. Lopez over a gun. Mr. Chapparro refused to return the gun. The Appellant and Mr. Cajero were outside the building prior to the fire. The Appellant was seen running, on fire, from the building. Mr. Chaparro was in the building at the time of the fire and was injured as a result of the fire. Shortly after the fire erupted, a handgun was found outside the building near the source of the fire.

Certainly, applying the law regarding relevancy of evidence to the above-mentioned facts, the gun was properly admitted as circumstantial evidence relative to the circumstances leading up to the crime. It is disingenuous for the majority to suggest that the State failed to establish that the gun lacked "any probative value." *See id.* Once again, however, whatever view one takes, the issue is here on appeal. Why no resolve it so that if the case is reversed, the trial court might have guidance on it.

Finally, I take issue with the majority's failure to resolve the admissibility of the gruesome photographs. The law is straightforward on this issue and it is of no benefit to either the State or the Appellant to leave this issue unresolved. *See State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).