The undersigned have reviewed the award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. Upon reconsideration of the evidence as a whole, the undersigned reach different facts and conclusions from those reached by the deputy commissioner. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate Award. Accordingly, the June 22, 1998, Opinion and Award by Deputy Commissioner Ford is HEREBY VACATED.
The Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties at the initial hearing as
 STIPULATIONS
1. A North Carolina Industrial Commission Form 21 Settlement Agreement approved September 1, 1994, appears in the Industrial Commission file.
2. On May 30, 1994, the parties were bound by and subject to the North Carolina Workers' Compensation Act.
3. On that date, the employer-employee relationship existed between the parties.
4. As of that date, defendant was a duly qualified self-insurer under the provisions of the North Carolina Workers' Compensation Act.
5. The plaintiff sustained an injury by accident arising out of and in the course of the employment with defendant-employer on May 30, 1994.
6. On that date, plaintiff was earning an average weekly wage of $229.81.
7. The only issue to be determined in this case is to what temporary total disability compensation benefits, if any, plaintiff is entitled under the Act after May 30, 1994.
8. The parties stipulated into evidence 20 pages of medical records; that plaintiff returned to work with restrictions after the incident of May 30, 1994 on February 20, 1995; that plaintiff last performed his work duties for defendant on April 3, 1997; and that plaintiff was terminated from his employment with defendant on April 8, 1997.
9. The parties further stipulate that plaintiff has suffered the following permanent disabilities as a result of the incident of May 30, 1994:
a. Five percent of the left arm;
b. Fifteen percent of the right leg;
c. Ten percent of the back.
10. It is further stipulated that plaintiff is making no claim in this action for heart or lung disabilities.
***********
At the initial hearing on February 3, 1998, the parties introduced the following exhibits:
1. Plaintiff's Exhibit 2, marked P2, consisting of a disciplinary warning dated March 5, 1997.
2. Defendant's Exhibit 1, marked D1, consisting of a memo dated February 3, 1997.
3. Defendant's Exhibit 2, marked D2, consisting of a list of plaintiff's absences from work.
4. Plaintiff's Exhibit 3, marked P3, consisting of a note dated June 7, 1995, which is stipulated into the record.
***********
Based upon all of the competent, credible, and convincing evidence of record, the undersigned make the following
 FINDINGS OF FACT
1. On May 30, 1994, plaintiff sustained an injury by accident in the course and scope of his employment when he attempted to ride a fractious horse in the performance of his work duties. He was attempting to mount the horse when the horse reared up and landed on him, causing serious bodily injuries. In particular, he suffered a five percent permanent partial disability to his left arm, a ten percent permanent partial disability to his back, and a fifteen percent permanent partial disability to his right leg.
2. Prior to his injury, plaintiff worked as a general maintenance man at the Sertoma Camp in Westfield, North Carolina. The camp is administered by North Carolina State University. At the time of the initial hearing, plaintiff was 54 years old. He cannot read or write, with the exception of being able to sign his name. His work experience consists of farming and working in construction. He worked in a furniture factory thirty years ago.
3. Subsequent to the May 30, 1994, accident, plaintiff remained out of work with the injuries to his left arm, right leg, and back. He was paid temporary total disability compensation pursuant to a Form 21 Settlement Agreement (dated September 1, 1994) until February 20, 1995, when he returned to employment with the defendant with work restrictions. In particular, he was restricted to a sitting-only position through June 7, 1995.
4. On June 7, 1995, plaintiff returned to Dr. O'Keefe, his treating physician, and reported that, despite the sitting-only restriction, he had been required to walk on inclines and to perform other tasks that were too physically demanding. On that date, Dr. O'Keefe imposed restrictions of walking and standing on level surfaces only, a 25 pound lifting restriction, and of no climbing or ascending ladders. In September of 1995, these restrictions were made permanent.
5. From June of 1995 until February of 1997, plaintiff's work experience was uneventful. He was not overtaxed physically. He functioned in a supervisory capacity directing the work of others, and he drove to nearby towns for supplies. From September 5, 1995, until March, 1997, the medical notes reveal that plaintiff only had four medical visits to Dr. O'Keefe's office, two of which were for orthopedic shoes. Plaintiff's restrictions were respected, and he could manage the work assigned to him.
6. In the fall of 1996, plaintiff underwent a physical examination required for the issuance of a life insurance policy. The examination revealed problems with plaintiff's heart and lungs. Plaintiff spent much of October, November, and December going to doctor's appointments with cardiologists and lung specialists. He was absent from work entirely on many of the days he attended the doctors' appointments due to his heart and lung conditions. Plaintiff missed 19 days between October 27 and December 31, 1996. Between January 1 and February 26, 1997, he missed 6 days.
7. The employer knew the cause of Mr. East's absences. Mr. Bowman, the camp's director, admitted that he knew there was grave concern on the part of Mr. East and his family due to Mr. East's potentially serious medical condition. Both plaintiff and his daughter, Carol, the camp secretary, had made Mr. Bowman fully aware of plaintiff's condition. Mr. Bowman also knew that a physician had prescribed Coumadin, a blood-thinning medication. He knew the therapeutic intent of Coumadin and was concerned that plaintiff might bleed excessively if he cut himself while working. Therefore, he had required the plaintiff to even bring a note from the doctor which would permit him to work around lawn equipment. Mr. Bowman did not make any critical remarks regarding plaintiff's numerous absences during the period when he was out to attend to the newly discovered heart and lung problems.
8. On February 3, 1997, plaintiff received a memorandum from Mr. Bowman, which asked for documentation from the "doctor or doctors" for a list of duties that he could not perform. Permanent work restrictions had already been in existence since September of 1995, and the plaintiff had been thus far accommodated.
9. On February 6, 1997, Mr. Bowman terminated plaintiff's daughter from her camp secretary position. From early February forward, for unexplained reasons, the employer no longer accommodated plaintiff's permanent restrictions and proceeded to alter plaintiff's work duties.
10. On March 5, 1997, Mr. Bowman issued a warning to plaintiff. The warning complained of plaintiff's failure to respond to the February note requiring a restriction list. It also complained, for the first time officially that: "you have been absent 23 working days dating back to October 27, 1996. [sic.] did not give explanation as to why days were missed or note from doctor."
11. Plaintiff returned to Dr. O'Keefe on March 24, 1997. Office notes from that visit state the following:
 "Mr. East had an episode on Thursday wherein he was climbing up a ladder, getting out of a pool upon which he was working while on the job, suffering a twisting injury to his leg. Upon further questioning, there has been some question about his restrictions at work. When I was last seeing Mr. East, he apparently was involved in a supervisory job which was working out well for him from the was standpoint of his physical restrictions. Presently, he [is] doing work which [is] very painful for his leg and back."
12. As a result of this visit, Dr. O'Keefe increased the restrictions to the point of allowing only sit-down work for the ensuing week. It appears that defendant-employer had no sit-down work available when he returned to work on April 2, 1997. A message note in Dr. O'Keefe's records from April 3, 1997, states: "[Plaintiff] went back to work yesterday. They put him to washing dishes, [sic.] he just can't do it because it hurts his back needs to know something today." The physician's office response was to fax a letter to the employer to take plaintiff out of work for April 3 and 4, 1997. April 5 and 6 were weekend days. Plaintiff did not report to work on Monday, April 7, 1997. Dr. O'Keefe's office excused plaintiff from work from April 8, 1997 through April 11, 1998, when an orthopedic shoe could be provided.
13. On April 8, 1997, defendant terminated plaintiff's employment by letter, for misconduct of which defendant claimed the following:
 a. that plaintiff informed Mr. Bowman he was being treated by Dr. O'Keefe, while, in fact he was being treated for unrelated conditions by other doctors.
 b. that plaintiff had frequent absences, including 23 days, which defendant claims was without explanation.
 c. that plaintiff was insubordinate in refusing to perform duties which were within his physical limitations (namely, the kitchen duties of washing dishes).
 d. that plaintiff spread untrue negative remarks about his employer.
14. However, the undersigned find that the competent, credible, and convincing evidence of record fails to convincingly establish that plaintiff was actually terminated for misconduct or fault, unrelated to the compensable injury, for which a non-disabled employee would ordinarily have been terminated. Defendant has failed to sufficiently meet its burden of proof in this regard and the reasons given by defendant for the dismissal are not credible and convincing.
15. On April 22, 1997, plaintiff was medically released to return to work with the same restrictions under which he had been working for the employer prior to April 3, 1997.
16. Defendant has not to date offered plaintiff his job back with the same medical restrictions at which he had been previously working without difficulty.
17. Plaintiff reached maximum medical improvement on March 27, 1997, when he was rated medically for permanent partial disability with respect to his left arm, right leg, and back.
18. Defendants have not credibly or sufficiently rebutted the presumption of plaintiff's continuing total disability created by the Form 21 Agreement, by producing evidence of plaintiff's ability or capacity to earn the same or similar wages as he was earning as of the time of his initial injury. Plaintiff continues to have severe physical restrictions as well as his age, inability to read, and limited prior work experience outside of manual labor. In addition, he now has heart and lung problems. All of these factors combine to make plaintiff unable to earn any wages in the same or any job at this time. Further, these conditions make it futile for plaintiff to seek employment at this time. Plaintiff, in fact, appears to have been terminated, in part, exactly because of the physical limitations he will permanently have as a result of his work-related injury.
***********
The foregoing stipulations and findings of fact engender the following
 CONCLUSIONS OF LAW
1. On May 30, 1994, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant. N.C.G.S. § 97-2(6).
2. As a result of his continuing total disability, plaintiff is entitled to continuing total disability benefits in the amount of $153.21 per week, beginning April 3, 1997 and continuing until further order of the Commission. N.C.G.S. § 97-29; Kisiahv. W. R. Kisiah Plumbing, Inc., 124 N.C. App. 72,476 S.E.2d 234 (1996).
3. Defendant did not convincingly establish plaintiff's misconduct. Thus, plaintiff's termination was not a valid result of any misconduct and does not fall within the first prong of theSeagraves test, which would have to be met in order to shift the burden onto plaintiff to prove his ongoing disability.Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228,472 S.E.2d 397 (1996).
4. Plaintiff is entitled to all medical expenses resulting from his compensable injury which may be necessary to effect a cure, give relief, or lessen his period of disability, once bills for the same have been properly submitted through the carrier for approval. N.C.G.S. § 97-2(19); N.C.G.S. § 97-25.
5. Plaintiff's attorney is entitled to a reasonable attorney's fees in the amount of twenty-five percent (25%) for her services in this matter. N.C.G.S. § 97-90.
***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
 AWARD
1. Defendant shall pay to plaintiff continuing total disability benefits in the amount of $153.21 per week, beginning April 3, 1997, and continuing until further order of the Commission. Such amount as has accrued shall be paid in a lump sum, subject to the attorney's fee awarded below.
2. Defendant shall pay all medical expenses resulting from plaintiff's compensable injury which may be necessary to effect a cure, give relief, or lessen his disability, once bills for the same have been properly submitted through the employer-carrier for approval.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee in the amount of twenty-five percent (25%) of the accrued total disability compensation. This amount shall be deducted from the accrued amounts due and shall be paid directly to plaintiff's counsel. Thereafter, every fourth check of compensation due plaintiff shall be paid directly to plaintiff's counsel.
4. Defendants shall bear the costs.
This case is ORDERED REMOVED from the Full Commission hearing docket.
This the ___ day of ________, 1999.
 S/_____________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
JHB:kws