IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2021 Term

No. 20-0601

**FILED**
**March 16, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL. PERRI DECHRISTOPHER
MONONGALIA COUNTY PROSECUTING ATTORNEY,
Petitioner

v.

THE HONORABLE PHILLIP D. GAUJOT,
JUDGE OF THE CIRCUIT COURT OF MONONGALIA COUNTY, AND
CESAR FELIX,
Respondents

WRIT GRANTED

Submitted:  February 10, 2021
Filed:  March 16, 2021

Stephen S. Fitz, Esq.
Perri DeChristopher, Esq.
Prosecuting Attorney Monongalia County
Morgantown, West Virginia
Counsel for Petitioner

Matthew C. Brock, Esq.
Morgantown, West Virginia
Counsel for Respondent
Cesar Felix

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.     "'Prohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for [a petition for appeal] or certiorari.'  Syllabus Point 1, *Crawford v. Taylor*, 138 W. Va. 207, 75 S.E.2d 370 (1953)."  Syllabus Point 1, *State ex rel. Franklin v. Tatterson*, 241 W. Va. 241, 821 S.E.2d 330 (2018).

2.     "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law,

should be given substantial weight." Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

3. "Whether an extrajudicial inculpatory statement is voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances." Syllabus Point 2, *State v. Bradshaw*, 193 W. Va. 519, 457 S.E.2d 456 (1995).

4. "In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*." Syllabus Point 2, in part, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

5. "The special safeguards outlined in *Miranda* are not required where a suspect is simply taken into custody, but rather only where a suspect in custody is subjected to interrogation." Syllabus Point 8, in part, *State v. Guthrie*, 205 W. Va. 326, 518 S.E.2d 83 (1999).

6. "The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of

an offense were voluntary before such may be admitted into the evidence of a criminal case." Syllabus Point 5, *State v. Starr,* 158 W. Va. 905, 216 S.E.2d 242 (1975).

7.      "'It is not necessary, as a prerequisite to obtaining a voluntary consent to a noncustodial search, that law enforcement officers give *Miranda* warnings or similar warnings relating to Fourth Amendment rights, although the subject's knowledge of a right to refuse is a relevant factor in determining whether the consent was voluntary and knowledgeable.' Syl. pt. 2, *State v. Basham*, W. Va., 223 S.E.2d 53 (1976)."  Syl. Pt. 1, *State v. Fellers*, 165 W. Va. 253, 267 S.E.2d 738 (1980).

8.      "The circuit court, and this Court on review, should consider the following six criteria when evaluating the voluntariness of a defendant's consent: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.  While each of these criteria is generally relevant in analyzing whether consent is given voluntarily, no one factor is dispositive or controlling in determining the voluntariness of consent since such determinations continue to be based on the totality of the circumstances."  Syllabus Point 3, *State v. Buzzard*, 194 W. Va. 544, 461 S.E.2d 50 (1995).

WALKER, Justice:

Cesar Felix was working at a restaurant in Morgantown, West Virginia on the same night when a woman reported that she was sexually assaulted after leaving the restaurant. When Morgantown police wanted to interview Mr. Felix, he voluntarily went to the station and brought with him a close family friend to act as an interpreter. Mr. Felix, who speaks Spanish as his primary language, denied any involvement in the crime in his statement to the detective and consented to a DNA search by cheek swab. After the DNA evidence linked Mr. Felix to the crime, he was charged with two counts of sexual assault. But Mr. Felix successfully moved to suppress his statement and the DNA evidence arguing among other things that he was not given *Miranda*[1] warnings or advised that he had a right to refuse his consent to the DNA search.

Perri DeChristopher, the Prosecuting Attorney of Monongalia County (State) now asks us to exercise our original jurisdiction and grant a writ to prohibit the circuit court from enforcing its order suppressing Mr. Felix's statement and DNA evidence. We grant the State's request because the circuit court committed clear legal error. Mr. Felix was not in custody when he gave his statement, so no *Miranda* warnings were required. And considering all the circumstances, Mr. Felix's statement was voluntary and not the product of coercive policy activity. So, Mr. Felix's Fifth Amendment privilege against self-

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

incrimination[2] and due process rights[3] were not violated. Likewise, because Mr. Felix consented to provide a sample for DNA testing, his Fourth Amendment protection against unreasonable searches was not violated.[4] For these reasons, we grant the writ of prohibition.

## I. FACTS AND PROCEDURAL HISTORY

In the early morning hours of May 14, 2016, a woman (the victim) notified authorities that a "Mexican looking" man had sexually assaulted her after she left a restaurant, Casa di Amici. The victim stated that the man offered to give her a ride home because she was intoxicated, and that she got in his car and eventually lost consciousness. Then, she woke up to find that the man had parked the car and was sexually assaulting her. After breaking free, the victim notified authorities and she was taken to the hospital where a sexual assault examination was performed. The following day, the victim reviewed Casa di Amici's surveillance videos and identified Mr. Felix as a possible suspect.[5]

Mr. Felix was working at Casa di Amici on the night of the alleged sexual assault. Detective Daniel Alejandro Trejo of the Morgantown Police Department left

---

[2] *See* U.S. Const., amend. V; W.Va. Const., art. III, § 5.

[3] *See* U.S. Const., amend. XIV; W.Va. Const., art. III, § 10.

[4] *See* U.S. Const., amend. IV; W.Va. Const., art. III, § 6.

[5] These facts, as presented by the State, are not refuted by Mr. Felix.

2

messages with the restaurant's manager and requested that Mr. Felix, and other employees, contact him for questioning.

Mr. Felix asked Stephanie Mayhew—a family member who is fluent in Spanish and works as a freelance interpreter—to help him speak with the police.[6] Mr. Felix speaks Spanish as his primary language. At Mr. Felix's request, Ms. Mayhew contacted the manager at Casa di Amici who gave her Det. Trejo's telephone number. On August 3, 2016, Ms. Mayhew telephoned Det. Trejo, again at the request of Mr. Felix. Detective Trejo explained that he was investigating a sexual assault and needed to speak with Mr. Felix. But, Detective Trejo did not say that Mr. Felix was a suspect. Ms. Mayhew explained that Mr. Felix wanted her to interpret for him and asked if they could come to the police station that day. Detective Trejo agreed.[7]

When Mr. Felix and Ms. Mayhew went to the police station to meet Det. Trejo, Ms. Mayhew translated for Mr. Felix during questioning, asked her own questions of Mr. Felix, and answered some of Det. Trejo's questions herself. Mr. Felix denied any involvement with the sexual assault. Ms. Mayhew, believing Mr. Felix was innocent, suggested that he submit a DNA sample. When Det. Trejo asked if he was willing to submit a DNA sample, Mr. Felix agreed. Detective Trejo provided a Permission to Search form

---

[6] Ms. Mayhew was engaged to a man in Mr. Felix's family at the time of the police interview.

[7] Detective Trejo recorded this telephone call.

3

and had Ms. Mayhew explain the form to Mr. Felix.[8] Mr. Felix signed the form and performed the cheek swab on himself to submit a DNA sample.[9] After the interview was concluded, Mr. Felix left the police station and was not placed in custody. This interview was videorecorded and lasted about 45 minutes.

---

[8] The Permission to Search form stated, in part, that

> I, Cesar Manuel Felix, having been informed by Det. D.A. Trejo . . . of the Morgantown Police Department of my CONSTITUTIONAL RIGHT not to have a search made of the premises and property owned by me and/or under my care, custody and control, without a search warrant.
>
> Knowing of my lawful right to refuse to consent to such a search, I willingly give my permission to the above named officer(s) to conduct a complete search . . . DNA swabs of Cesar Manuel Felix[.]"

The form was signed by Mr. Felix; Ms. Mayhew and Det. Trejo signed the form as witnesses.

[9] Mr. Felix's DNA was collected using a common procedure known as a "buccal swab." "Buccal cell collection involves wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells. The procedure is quick and painless." *Maryland v. King*, 569 U.S. 435, 444 (2013) (citation and quotation marks omitted).

4

After the results from the DNA test linked Mr. Felix to the crime,[10] he was charged by indictment with one count of second-degree sexual assault and one count of first-degree sexual assault in January 2020.[11]

In April 2020, Mr. Felix moved to suppress the statement he made during the August 3, 2016 police interview, claiming that it "was obtained illegally in violation of [his] rights as enunciated under the Fifth Amendment to the Constitution of the United States and Article 3-5 of the Constitution of West Virginia, regarding his right to remain silent" as construed in *Miranda*. Mr. Felix also moved to suppress his DNA evidence, claiming that the search "violated his rights under the Fourth Amendment to the United States Constitution and Article 3-6 of the Constitution of West Virginia, regarding his right to privacy[.]" In support of his motion, Mr. Felix stated that during the police interview Ms. Mayhew, "act[ed] on behalf of and as an agent of the Morgantown Police Department," because he was not sufficiently able to "speak, read, write, or comprehend the English Language." He stated that neither Det. Trejo or Ms. Mayhew informed him of all the consequences of what he was asked to sign, and he did not feel that Ms. Mayhew

---

[10] The State reports that a sperm fraction matching Mr. Felix's DNA was found in the vaginal area of the victim.

[11] In January 2020, a Monongalia County Grand Jury returned a two-count indictment charging Mr. Felix with second-degree sexual assault in violation of West Virginia Code § 61-8B-4 (2020) and first-degree sexual assault in violation of West Virginia Code § 61-8B-7 (2020).

"accurately and completely translated or described much of the interview questions" or the document he signed.

In its response to Mr. Felix's motion to suppress, the State argued that Mr. Felix's volunteered statements were not barred by the Fifth Amendment and that *Miranda* did not apply because Mr. Felix was not in custody. The State also noted that Mr. Felix not only verbally agreed to provide a DNA sample, he also signed written authorization for the search. Finally, the State characterized Mr. Felix's attempt to claim that Ms. Mayhew acted as an agent of the Morgantown Police Department a "complete fabrication and a misstatement of the facts [because Ms. Mayhew] was a friend and associate of the Defendant and [Ms. Mayhew] specifically told the Detective in a recorded phone call that the Defendant asked her to translate for him."

On July 13, 2020, the circuit court held a hearing on Mr. Felix's motion to suppress and provided him with a court-appointed interpreter.[12] Defense counsel called

---

[12] *See* W. Va. R. Crim. P. 28 ("(b) Interpreters. The court may order the defendant or the state to show cause for appointment of an interpreter. The court may appoint an interpreter of its own selection and may fix the reasonable compensation of such interpreter. Such compensation shall be paid out of funds provided by law or by the state, as the court may direct.").

The record does not reflect whether the court-appointed interpreter for this proceeding was qualified. Like other expert witnesses, interpreters are subject to evidentiary rules relating to qualification and must be appropriately sworn at court proceedings. Rule 604 of the West Virginia Rules of Evidence provides that "[a]n (continued . . .)

Det. Trejo and Ms. Mayhew as witnesses. Mr. Felix did not testify at the suppression hearing.

Detective Trejo testified that he did not give Mr. Felix *Miranda* warnings because it was a noncustodial interview. Although Mr. Felix did not speak much English during the interview, Det. Trejo stated that it appeared Mr. Felix "understood English pretty well" and comprehended the questions asked. When asked by defense counsel if Ms. Mayhew "sort of took over the interview" by asking questions herself, Det. Trejo stated, "I don't believe so."

Detective Trejo also testified that Mr. Felix agreed to submit a DNA sample; he gave the Permission to Search form to Mr. Felix, had Ms. Mayhew read the form to him, and Mr. Felix expressed no difficulty in understanding it. Detective Trejo stated that he handed the swab to Mr. Felix who performed the cheek swab himself.

Ms. Mayhew[13] testified that she works as a freelance interpreter, has a bachelor's degree in foreign languages, and is fluent in Spanish. Ms. Mayhew stated that

---

interpreter must be qualified and must give an oath or affirmation to make a true translation."

[13] Ms. Mayhew was married at the time of the suppression hearing and had changed her name to Stephanie Murillo. To avoid confusion, we continue to refer to Ms. Mayhew by her maiden name.

she knows Mr. Felix well and provides interpretive services to his family.[14] Ms. Mayhew stated that she believed that Mr. Felix understood what took place during the police interview:

> Q. [Assistant prosecuting attorney] Now, I want the Court to know this. You have reviewed the video of that interview, correct?
>
> A. Briefly, yes.
>
> Q. And you've also reviewed a transcript?
>
> A. Yes.
>
> Q. Do you believe that Mr. Cesar Felix understood what was going on in that interview?
>
> A. Yes, I do.
>
> Q. Now, it is fair to say that you did ask questions that the detective did not ask; is that correct?
>
> A. Correct.
>
> Q. And explain to the Court why you did that.
>
> A. I did that because I wanted him to give as much detail as possible. Because I felt he wasn't guilty because he said she never even got in his car and he never touched her at that point in time is what he told me.

When defense counsel asked Ms. Mayhew if she suggested that Mr. Felix offer a DNA sample before Det. Trejo asked for it, she replied,

---

[14] Ms. Mayhew testified that she had translated for Mr. Felix's "aunts, his fiancée, his uncles, his cousins—everybody that's here in Morgantown—in court, at the DHHR, at doctor appointments, WIC appointments."

Yes. Because I felt he was not guilty because he was adamant that she never got in his car. So I wanted him to be exonerated. I did not want this kid to go back to Mexico. I didn't want him to be part of this crime. He had a fiancée and a baby that I loved.

The assistant prosecuting attorney asked Ms. Mayhew to clarify whether Mr. Felix agreed to submit his DNA sample after she suggested that he offer it:

Q. When you asked about the DNA, did it appear that he was willing to do that voluntarily?

A. Yes. Because I explained to him what the DNA is -- was. Because [Det. Trejo] said, "Can you explain that to him?"
. . .
You can hear me say that it's found in your sperm, if in any way that you touched her, it's going to come back to you. They don't know whether it's you or not you.

Q. And then the detective gave you a form to go over with Mr. Felix; is that correct?

A. Yes, he did.

Q. And do you feel you went over that very clearly with him?

A. Yes, I do.

Q. Well, enough that you signed off on that to acknowledge that you went over it with him?

A. Yes.

At the conclusion of the suppression hearing, the circuit court granted Mr. Felix's motion to suppress his statement and DNA evidence and stated, "I'm not suggesting that the State did anything wrong. I'm just saying . . . Mr. Felix did not understand that he

9

had a constitutional right, and understand [sic] those rights significantly enough to weigh in."

In its order granting Mr. Felix's motion to suppress, the circuit court made five findings. As to Mr. Felix's statement, the circuit court found:

> 1. The Defendant did not understand his constitutional rights and was not advised prior to the interview that he was a suspect in the sexual assault, but only that he was advised that a sexual assault was being investigated by the detective prior to coming in for an interview.
>
> 2. The translator, a family friend brought in by the Defendant, exceeded her duty as the Defendant's translator by asking questions of the Defendant during the interview.
>
> 3. The Defendant was not fully disclosed prior to the interview the full nature of the investigation and that he was a possible suspect only that the Detective was investigating a sexual assault. The Defendant was not told he could leave at any time or end the interview at any time.

Regarding Mr. Felix's DNA evidence, the circuit court found:

> 4. Although the [D]efendant signed a voluntary permission form to provide his DNA, and although the Defendant and his translator went over the permission form together, the Court finds [the] Defendant did not fully understand his constitutional rights as he was not advised of them by the Detective.
>
> 5. The Defendant did not voluntarily, knowingly or intelligently waive his right to refuse a search of his person for the DNA because he was not told he could refuse.

The State seeks to prohibit the enforcement of this ruling.

10

## II. STANDARD FOR ISSUANCE OF WRIT

The general standard for issuance of a writ of prohibition is set in West Virginia Code § 53-1-1 (2016), which states that "[t]he writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not [sic] jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." With respect to the extraordinary remedy of a writ of prohibition, we have explained that

> "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for [a petition for appeal] or certiorari." Syllabus Point 1, *Crawford v. Taylor*, 138 W. Va. 207, 75 S.E.2d 370 (1953).[15]

Under these circumstances, this Court considers five factors as guidelines for whether a writ of prohibition should issue:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first

---

[15] Syl. Pt. 1, *State ex rel. Franklin v. Tatterson*, 241 W. Va. 241, 821 S.E.2d 330 (2018).

11

impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.[16]

As a general rule, "[p]rohibition is ordinarily inappropriate in matters involving a trial court's pretrial ruling on . . . the admissibility of evidence."[17] But in circumstances like this case, when the State has no other adequate means to obtain the desired relief and the issue is not one that would be correctable on appeal, this Court has entertained a petition for a writ of prohibition.[18]

## III. ANALYSIS

The State's petition presents two discrete legal questions. We first determine whether the circuit court committed clear legal error in suppressing Mr. Felix's statement. This Court has held that "[w]hether an extrajudicial inculpatory statement is voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances."[19] Then, we determine whether the circuit court committed clear legal error in suppressing Mr. Felix's DNA evidence. This Court conducts

---

[16] Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

[17] *Policarpio v. Kaufman*, 183 W. Va. 258, 261, 395 S.E.2d 502, 505 (1990).

[18] *State ex rel. Wade v. Hummel*, 243 W. Va. 408, 844 S.E.2d 443 (2020).

[19] Syl. Pt. 2, *State v. Bradshaw*, 193 W. Va. 519, 457 S.E.2d 456 (1995).

an independent review of the ultimate legal question of whether Mr. Felix voluntarily

consented to the search of his DNA, rendering it reasonable under the Fourth Amendment.

> In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*.[20]

With these standards in mind, we consider the parties' arguments.

## A. Statement to the Police was Voluntary

We first address whether the circuit court committed clear legal error by

suppressing the statement Mr. Felix gave to Det. Trejo at the August 3, 2016 interview.

The State argues that Mr. Felix's statement is admissible because he gave it voluntarily.

Mr. Felix (with Ms. Mayhew's help) arranged to meet with Det. Trejo, agreed to take part

in this non-custodial interview, and came to the police station voluntarily to give this

statement. Mr. Felix responds that his statement was not given knowingly, voluntarily, or

intelligently. In his summary response to this Court, Mr. Felix does not cite *Miranda* or

argue that he was in custody at the time of the police interview. But, he argues that Det.

Trejo failed to advise him of certain constitutional rights, so he at least alludes to this

---

[20] Syl. Pt. 2, in part, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

13

principle of law.[21]  Mr. Felix states that he was never informed that he was a suspect and was never informed that he was free to leave after it became clear that he was the main suspect.  He also complains that Ms. Mayhew interjected herself into the questioning by Det. Trejo to the point that it rendered the entire interview involuntary because Mr. Felix never agreed to be "double-teamed."  Mr. Felix maintains that Ms. Mayhew acted outside and beyond her scope as a translator and Det. Trejo failed to reign her in or maintain control of the interview.

The evidence at the suppression hearing readily establishes that Mr. Felix was not in custody as defined in *Miranda*[22] at any point during the interview with Det. Trejo.  Ms. Mayhew testified that Det. Trejo did nothing to suggest that she and Mr. Felix were detained.  And Mr. Felix cites nothing in the record to suggest otherwise.  So, Det. Trejo was not required to give him *Miranda* warnings because a police officer's obligation to administer those warnings is triggered only during custodial interrogation.  This Court

---

[21] Before the circuit court, Mr. Felix ardently made the case that his statement was obtained without a proper *Miranda* warning and without him understanding the consequences of the decision to abandon his right to remain silent in violation of the Fifth Amendment.  The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states: "No person . . . shall be *compelled* in any criminal case to be a witness against himself." (Emphasis added).  Similarly, the West Virginia states: "That in all criminal prosecutions, the accused . . . shall not be *compelled* to give evidence against himself."  W.Va. Const. art. III, § 5. (Emphasis added).

[22] In *Miranda*, the United States Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.

has held that "[t]he special safeguards outlined in *Miranda* are not required where a suspect is simply taken into custody, but rather only where a suspect in custody is subjected to interrogation."[23] And as the United States Supreme Court has explained, "police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."[24] So *Miranda* has no applicability here.

Instead, the ultimate question is whether Mr. Felix's statement was obtained in a manner that comports with due process.[25] The use of an involuntary statement or confession by a defendant in a criminal trial is a violation of the Fourteenth Amendment to the United States Constitution and § 10 of article III of the West Virginia Constitution.[26] "The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case."[27] "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'

---

[23] Syl. Pt. 8, in part, *State v. Guthrie*, 205 W. Va. 326, 518 S.E.2d 83 (1999).

[24] *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

[25] *Miller v. Fenton*, 474 U.S. 104, 110 (1985).

[26] *State v. Honaker*, 193 W. Va. 51, 57, 454 S.E.2d 96, 102 (1994).

[27] Syl. Pt. 5, *State v. Starr,* 158 W. Va. 905, 216 S.E.2d 242 (1975).

within the meaning of the Due Process Clause of the Fourteenth Amendment."[28]  Police coercion includes not only physical abuse or threats directed at a suspect but also forms of psychological coercion.[29]

We examine whether the police actions, together with other circumstances surrounding the interrogation, were so coercive or overpowering that Mr. Felix was deprived of his ability to make a voluntary decision to speak with Det. Trejo as he did.[30] Many of the same factors and circumstances leading to our determination that the interview was noncustodial inform our analysis of voluntariness.  When testifying at the suppression hearing, Det. Trejo and Ms. Mayhew agreed on several key points:  Mr. Felix came to the police station voluntarily to give a statement, he understood the questions that were asked of him, and he freely cooperated.  There was no evidence that Mr. Felix's statement was

---

[28] *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also Honaker*, 193 W. Va. at 58-59, 454 S.E.2d at 103-04 ("We share the opinion of the Supreme Court that police involvement must be evident before a statement is considered involuntary under the West Virginia Due Process Clause.").

[29] *See People v. Smith*, 150 P.3d 1224, 1238 (Ca. 2007) (stating courts have prohibited psychological ploys when they are so coercive that a defendant's statement or confession is rendered both involuntary and unreliable).

[30] *See e.g.*, *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991) (("[O]ur inquiry examines whether [the police] actions, together with other circumstances surrounding the interrogation, were so coercive, so manipulative, so overpowering that [the defendant] was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did.").

the result of police coercion or improper inducements by the police—factors that could be shown had they existed—because the interview was recorded by video.

Mr. Felix has failed to present us with any objective evidence to show that his statement was the result of police coercion. To the contrary, in his motion to suppress, Mr. Felix stated that Det. Trejo was friendly during the interview.

> It is also curious how, after [the victim] informed Morgantown Police at the initial investigation stage that she believed the assailant to be of Mexican decent, that Trejo, a Latino American Detective was assigned to the case. It is of great consequence that Felix believed Trejo to be a "friend" in that they shared similar ethnicity, and that Trejo would aid Felix in protecting him from being taken advantage of in the legal sense.

We are unconvinced that Det. Trejo's empathetic interview technique was overly manipulative or coercive. Police must be allowed to encourage suspects to talk, and courts have upheld interview tactics that prod suspects to cooperate with police.[31] And, while Det. Trejo did not disclose that Mr. Felix was the main suspect in the crime, Det. Trejo did not make misrepresentations when he told Mr. Felix that he was investigating a sexual assault.[32]

---

[31] *State v. Thaggard*, 527 N.W.2d 804, 807 (Minn. 1995).

[32] *See e.g.*, *State v. Roach*, 680 A.2d 634 (N.J. 1996) (upholding confession despite defendant's allegation that police deceived him into thinking he was only giving statement (continued . . .)

We now turn to Mr. Felix's argument that his statement was rendered involuntary by the actions of his interpreter, Ms. Mayhew. In *State v. Johnson*[33] the defendant, who was deaf, raised similar constitutional challenges as Mr. Felix does here under similar facts. But unlike Mr. Felix, the defendant in *Johnson* offered evidence at the suppression hearing to support his claim that problems with the sign-language interpretation rendered his police-station confession involuntary. In that case, a police officer asked the defendant to come to the station for a noncustodial interview and the officer provided the defendant a sign-language interpreter.[34] Well into the nearly three-hour interrogation, the defendant confessed to having sexual contact with his step-daughter. When the interview was concluded, the officer allowed the defendant to leave. After he was indicted for those crimes, the defendant filed a pre-trial motion to suppress his confession arguing that the confession was not voluntary because of problems with the police interpreter.[35] At the suppression hearing, the defendant called two expert witnesses: an expert in legal interpretation, who testified that certain semantic translation errors were made during the interview;[36] and a forensic psychiatrist, who testified that the defendant's

---

as a witness as there was no evidence that the statement was not the product of an essentially free and unconstrained choice).

[33] 860 N.W. 2d 235 (S.D. 2015).

[34] *Id*. at 238.

[35] *Id*. at 240.

[36] *Id*. at 241.

ability to meaningfully understand his rights was compromised during the police interview "due to his deafness, . . . and his reliance on interpretations and body language to understand what was happening."[37] But the trial court denied the defendant's motion to suppress and this ruling was affirmed by the Supreme Court of North Dakota on appeal.

The *Johnson* court found that the totality of the evidence demonstrated that the defendant's confession was voluntary because the officer was not overly coercive or deceitful and never made any physically aggressive moves toward the defendant.[38] The same analysis applies to the circumstances surrounding Mr. Felix's police interview.

In *State v. Garcia*,[39] the Spanish-speaking defendant also raised arguments similar to Mr. Felix's in a motion to suppress a statement that he gave at the police station to a bilingual police officer. The Supreme Court of Connecticut held that the failure of police to provide the defendant with a disinterested, certified interpreter during the non-custodial interview did not violate his due process rights. Instead, this police procedure

---

[37] *Id.*

[38] *Id.* at 247.

[39] 7 A.3d 355 (Conn. 2010).

19

presented an evidentiary claim as to trustworthiness and reliability of the defendant's written statement.[40]

While Mr. Felix complains that Ms. Mayhew actively participated in the interview beyond the scope of a disinterested interpreter, it is undisputed that Ms. Mayhew was there at his request. Ms. Mayhew was not only acting as his interpreter, she was also there as a friend trying to help him provide exculpating details.[41] As stated above, only state action implicates a suspect's rights under the Fifth Amendment.[42] In the same

---

[40] *Id*. at 365.

[41] When defense counsel asked what her role was during the police interview, Ms. Mayhew stated:

> A.  Again, I was there as his friend and his family member. And I believed that he did not do anything, and I wanted to get to the bottom of everything that he might have known so that he was exonerated. So I was asking a lot more detailed questions to make sure that he understood everything.
>
> Q.  What do you mean, that he understood everything?
>
> A.  That he -- that he understood what they were trying to ask of him about that night. They wanted -- obviously, when this kind of situation happens, you want detail. And he had said there were two other guys with her. The manager also told me that they thought that two black guys had done something to this girl. So I felt the more detail he could give them, the more it would show that he didn't do anything. The more vague someone is, or general, then you don't know. So I was trying to help him.

[42] *See Connelly*, 479 U.S. at 170 ("[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. . . . [T]he Fifth Amendment privilege (continued . . .)

20

fashion, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."[43]  So, Mr. Felix's criticism of Ms. Mayhew's interrogation techniques falls on him, not the State.  "The Due Process Clause is aimed at protecting suspects from police overreaching, not at protecting people from themselves or other private actors."[44]  Although Mr. Felix tries to characterize Ms. Mayhew as "assisting Det. Trejo's investigation, based on her actions, and based on Det. Trejo's inaction[,]" the evidence demonstrates that Ms. Mayhew questioned Mr. Felix in her own way, on her own initiative, without any scripting or guidance from the police because she wanted to help him.  Mr. Felix cannot plausibly contend that Ms. Mayhew, acting on behalf of the police, coerced him into answering questions.[45]

In *Graham v. United States*,[46] the court rejected the defendant's argument that his murder confession should have been suppressed because the police obtained it by

---

is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'") (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

[43] *Connelly*, 479 U.S. at 167.

[44] *Oursbourn v. State*, 259 S.W.3d 159, 170 (Tex. Crim. App. 2008).

[45] Mr. Felix's criticism of the quality of Ms. Mayhew's interpretive services lacks evidentiary support.  Although Mr. Felix notes that Ms. Mayhew was not a certified translator, he offers no authority for the suggestion that she was unqualified to provide interpretive services at a noncustodial police interview.

[46] 950 A.2d 717 (D.C. 2008).

21

allowing his mother to question him after he invoked his Fifth Amendment right to counsel following his arrest.[47] The defendant argued that police acted improperly by allowing his mother to remain in the interview room, where she continued to press him to tell the truth and confess to the murder. But the court in *Graham* found that the fundamental problem with the defendant's argument was that his mother's private questioning was not state action subject to Fifth Amendment requirements.[48] The court noted that the fact that the defendant "may have been worn down emotionally by his mother did not render his confession involuntary" for purposes of the Due Process Clause, in the absence of coercive police practices.[49] Similarly, Ms. Mayhew's role in Mr. Felix's interview does not undermine the voluntary nature of his statement.

Mr. Felix relies on *State v. Lopez*[50] to support his argument that his statement was rendered involuntary by Ms. Mayhew's conduct, but this reliance is misplaced. In *Lopez*, the Spanish-speaking defendant, who had the mental capacity of a five-year-old, was in the hospital under the influence of Demerol when questioned by police. And the interpreter who was brought in by the detective to assist in the questioning was struggling

---

[47] *Id*. at 731.

[48] *Id*.

[49] *Id*. at 737.

[50] 197 W. Va. 556, 476 S.E.2d 227 (1996).

to translate and proffering questions that the officer was not even asking.[51]  Based on these egregious facts, this Court found that the record failed to establish that the defendant's statement was voluntary.  *Lopez* is easily distinguishable from the facts present here because the interpreter was a state actor, and the defendant suffered from mental deficiencies and was under the influence of prescription medication during the police interrogation.

The only evidence presented at the suppression hearing demonstrates that Mr. Felix's statement was voluntary for purposes of the Due Process Clause, and not obtained in violation of his Fifth Amendment rights.  So, the circuit court committed clear legal error in suppressing his statement.

### B. Cheek Swab was Taken under Valid Consent

We also consider whether the circuit court committed clear legal error by suppressing Mr. Felix's DNA evidence.  The State argues that this evidence is admissible because Mr. Felix agreed to give a DNA sample and consented to the cheek swab.  Mr. Felix responds that Det. Trejo's "biggest failure" was that he neglected to make sure that

---

[51] *Id*. at 564, 476 S.E.2d 227.

Mr. Felix understood the rights he was waiving prior to signing the Permission to Search form, thereby violating Mr. Felix's Fourth Amendment right to privacy.[52]

The Fourth Amendment protects people from unreasonable governmental searches and seizures. Normally, the Fourth Amendment is satisfied when police obtain a warrant, but a warrant is not required when there is consent to search.[53] The State has the burden of demonstrating that consent to search was freely given and was not a result of duress.[54] And whether a suspect's consent to a search is voluntary or the product of duress

---

[52] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend. IV. This Court has traditionally construed article III, § 6 of the West Virginia Constitution in harmony with the Fourth Amendment, because the language is very similar. *State v. Duvernoy*, 156 W. Va. 578, 582, 195 S.E.2d 631, 634 (1973).

[53] "The State and Federal Constitutions prohibit only unreasonable searches and seizures and there are numerous situations in which a search and seizure warrant is not needed, such as . . . property that has been abandoned, as well as searches and seizures made that have been consented to." Syl. Pt. 1, in part, *State v. Angel*, 154 W. Va. 615, 177 S.E.2d 562 (1970).

[54] *State v. Farmer*, 173 W. Va. 285, 289, 315 S.E.2d 392, 396 (1983).

or coercion, express or implied, is a factual determination based on the totality of all the circumstances.[55]

Mr. Felix argues that Det. Trejo neglected to advise him of his constitutional rights prior to him signing the Permission to Search form, thereby violating his Fourth Amendment rights. But *Miranda* warnings are designed to protect a suspect's Fifth Amendment right not to incriminate himself, and the Sixth Amendment right to counsel, rather than a suspect's Fourth Amendment right to be free from unreasonable searches and seizures. This Court has held that the Fourth Amendment does not require *Miranda* warning before officers ask for consent to search.

> "It is not necessary, as a prerequisite to obtaining a voluntary consent to a noncustodial search, that law enforcement officers give *Miranda* warnings or similar warnings relating to Fourth Amendment rights, although the subject's knowledge of a right to refuse is a relevant factor in determining whether the consent was voluntary and knowledgeable." Syl. pt. 2, *State v. Basham*, W. Va., 223 S.E.2d 53 (1976).[56]

Even though Det. Trejo was not required to advise Mr. Felix of his Fourth Amendment rights, he provided the police department's Permission for Consent to Search

---

[55] *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1972); *see also* Syl. Pt. 8, *State v. Craft*, 165 W. Va. 741, 272 S.E.2d 46 (1980).

[56] Syl. Pt. 1, *State v. Fellers*, 165 W. Va. 253, 267 S.E.2d 738 (1980).

form that advised Mr. Felix of his "lawful right to refuse to consent to such a search[.]"[57] Ms. Mayhew went over the form with Mr. Felix and there is nothing in the record that indicates he did not understand what was explained to him.

When determining whether Mr. Felix consented to a search of his DNA, we are guided by six factors:

> The circuit court, and this Court on review, should consider the following six criteria when evaluating the voluntariness of a defendant's consent: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel. While each of these criteria is generally relevant in analyzing whether consent is given voluntarily, no one factor is dispositive or controlling in determining the voluntariness of consent since such determinations continue to be based on the totality of the circumstances.[58]

Considering these factors and the totality of the circumstances, we find no merit to Mr. Felix's challenge to his consent to the DNA swab. First, Mr. Felix was not in custody. Second, Mr. Felix points to nothing in the record to show that Det. Trejo threatened or coerced him. Third, Det. Trejo gave Mr. Felix a Permission to Search form that stated he had the right to refuse and Ms. Mayhew went over this form with him.

---

[57] *See* note 8, *supra*.

[58] Syl. Pt. 3, *State v. Buzzard*, 194 W. Va. 544, 461 S.E.2d 50 (1995).

Fourth, while Ms. Mayhew stated that Mr. Felix was not educated in the United States, and we do not know his education level or intelligence, there is nothing in the record to indicate that Mr. Felix suffered from any mental deficiencies or that his respective intelligence prevented him from understanding Det. Trejo's request as explained to him by Ms. Mayhew. Fifth, it is unclear whether Mr. Felix believed that incriminating evidence would be found. And sixth, it appears that Mr. Felix fully cooperated with law enforcement and had no objection to providing the DNA swab. Based on all of these factors, we determine that no search warrant was required because Mr. Felix voluntarily consented to providing law enforcement with a DNA sample. So, the circuit court committed clear legal error in suppressing Mr. Felix's DNA evidence.

## C.      *Extraordinary Relief*

Having found that the circuit court's suppression ruling constituted clear legal error, we now turn to the State's argument that a writ of prohibition is the appropriate remedy. The State maintains that sexual assault cases are manifestly difficult to prosecute and Mr. Felix's statement and DNA evidence is necessary and compelling evidence to secure justice. Mr. Felix responds that a writ of prohibition is not appropriate because if the circuit court's suppression ruling remains undisturbed, the State can, and likely will, continue to pursue criminal charges against him. The State has other items of evidentiary value including the victim's statements, photographs of Mr. Felix's vehicle, surveillance

27

video from inside the restaurant from the night in question, statements from other employees, and evidence supplied by Ms. Mayhew.

We conclude that to correct the clear legal error on the part of the circuit court in its suppression ruling, we must grant this writ of prohibition. Without this writ, the State may otherwise be without a remedy to correct this legal error. "[L]aw enforcement, the defense bar, and the courts have acknowledged DNA testing's 'unparalleled ability both to exonerate the wrongly convicted and to identify the guilty. It has the potential to significantly improve both the criminal justice system and police investigative practices.'"[59] Because the circuit court's ruling would prohibit not only Mr. Felix's statement but his DNA evidence, it could impede the State's ability to secure a valid criminal conviction.

## IV. CONCLUSION

For the reasons set out above, we grant the requested writ and prohibit the Circuit Court of Monongalia County from enforcing its July 16, 2020 suppression order.

Writ Granted.

---

[59] *Maryland v. King*, 569 U.S. at 442 (quoting *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009).